UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -                                                  Cr. No. 12-691 (JFK)

JOSEPH ROMANO and
DEJVID MIRKOVIC,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN ANONYMOUS JURY AND OTHER RELATED PROTECTIVE MEASURES

                                                          ERIC H. HOLDER, JR.
                                                          Attorney General of the United States
                                                          WILLIAM J. HOCHUL, JR.
                                                          United States Attorney
                                                          Western District of New York

MARSHALL L. MILLER
UNA A. DEAN
Assistant United States Attorneys
       (Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND ......................................................................................................2

I.        The Coin Fraud Prosecution ............................................................................................2

II.      The Conspiracy to Murder the Judge and the AUSA .......................................................4

III.     Efforts to Corrupt the Judicial Process ............................................................................7

IV.     Media Attention ................................................................................................................8

DISCUSSION ...............................................................................................................................8

I.        Applicable Legal Standard ...............................................................................................8

II.      An Anonymous Jury is Necessary and Appropriate in this Case ...................................10

          A.     Nature and Seriousness of the Charges ..............................................................10

          B.     Corruption of Judicial Process ............................................................................11

          C.     Publicity ..............................................................................................................12

III.     An Anonymous Jury Will Not Prejudice the Defendants ...............................................13

CONCLUSION ............................................................................................................................15

# **PRELIMINARY STATEMENT**

The government submits this memorandum of law in support of its motion for an anonymous jury and other related protective measures. Specifically, the government requests that the names, addresses and places of employment of members of both the venire and petit juries not be revealed, that the jurors be kept together during recesses and taken or provided lunch as a group each day during trial, and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service. In short, the government asks that the Court empanel an anonymous and semi-sequestered jury in this matter.

Anonymous juries subject to these additional precautions have been empaneled in numerous cases charging threats, conspiracies and acts of violence intended to obstruct the judicial process. See, e.g., United States v. Quinones, 511 F.3d 289 (2d Cir. 2007); United States v. Thai, 29 F.3d 785 (2d Cir. 1994); United States v. Thomas, 757 F.2d 1359 (2d Cir. 1985). The factors that warranted an anonymous jury and other protective measures in those cases compel the same result here. As discussed below, because this case charges a murder conspiracy targeting a federal prosecutor and judge on account of the performance of their official duties, the defendants engaged in that conspiracy while defendant Joseph Romano was in custody at a detention facility, defendant Romano has previously engaged in violent witness tampering, and the case has garnered substantial media attention, a fair trial requires empaneling an anonymous jury and other requested protective measures.

**FACTUAL BACKGROUND**

Defendants Joseph Romano and Dejvid Mirkovic have been charged with engaging in a conspiracy to murder a United States District Judge (the "Judge") and an Assistant United States Attorney ( the "AUSA") on account of the performance of their official duties, in order to exact revenge and to remove them from Romano's ongoing federal prosecution for fraud. During the course of that fraud prosecution, Romano engaged in witness tampering through threats of violence, violated the terms of his bail by engaging in continued acts of fraud with Mirkovic, and planned an escape from prison after his remand.

I.    The Coin Fraud Prosecution

From approximately August 2001 through November 2008, defendant Joseph Romano owned and operated corporations that engaged in the telemarketing and sale of coins, which conducted business out of offices in Amityville and Copiague, New York (the "coin business"). Indictment, United States v. Romano, 09 CR 170 (S-2), ¶¶ 1-4. The coin business was an elaborate fraud. In order to fraudulently induce unsuspecting customers to invest in coins, defendant Romano and his coconspirators made a series of materially false promises regarding, among other things, the coins' grade, value and resale demand. Id. at ¶¶ 17-23. For example, defendant Romano and his coconspirators sold the coins at fraudulently inflated prices, misrepresenting their value to victim customers by falsely claiming that the coins were of particular high grades, when they were actually of a much poorer quality. Id. at ¶ 22. Romano and his coconspirators also falsely claimed that there were investors waiting to purchase complete sets of the coins at higher prices, once the victim customers made sufficient purchases from the coin business to assemble complete sets. There were no such investors. Id. at ¶¶ 19-21. The fraud generated over $40 million in revenue. Id. at ¶ 23.

The defendant Joseph Romano was indicted in the Eastern District of New York in connection with the coin fraud, and the case was assigned by random selection to the

Judge.  See Indictment, United States v. Romano, et al., 09 CR 170.  The AUSA was the lead prosecutor assigned to that case.  One of Romano's co-defendants was Russell "Rusty" Barnes.  Id.  After arrest, Romano was released on a $1,000,000 bond secured by property, and Barnes was released on a $200,000 personal recognizance bond.  As a condition of the bonds, Romano and Barnes each agreed to "refrain from telemarketing activities of any kind."  Affidavit in Support of Government's Motion to Revoke Bail, United States v. Romano, et al., 09 CR 170.

During the course of the prosecution, defendant Barnes engaged in proffer sessions with the government in an effort to secure a cooperation agreement.  In the midst of that effort, the government was abruptly informed that Barnes no longer wished to cooperate.  As set forth below, Romano was subsequently captured on a consensual recording explaining that Barnes ceased cooperating with the government because Romano threatened to kill Barnes if he continued to cooperate, and because Romano offered to employ Barnes in a new coin business if he stopped cooperating.

Based on witness information, telephone records, bank records, emails and surveillance, the government determined that from February 2009 through March 2010, defendant Romano and Barnes were engaged in another fraudulent scheme involving coin telemarketing in Florida, along with defendant Dejvid Mirkovic.  Affidavit in Support of Government's Motion to Revoke Bail, United States v. Romano, et al., 09 CR 170.  The AUSA then moved for the Court to revoke defendant Romano's bail.  Id.  The Court granted the government's motion, and Romano was incarcerated at the Nassau County Correctional Center ("NCCC").  Barnes was incarcerated at the Queens Private Detention Facility; he died in custody of natural causes on June 4, 2010.

On September 28, 2010, defendant Romano pled guilty before the Judge to conspiracy to commit wire and mail fraud, in violation of Title 18, United States Code,

Section 1349. Complaint, United States v. Romano, et al., M-12-929, ¶ 3. Subsequently, on February 9, 2012, the Judge sentenced Romano to a term of imprisonment of 15 years. Id. Romano remained at the NCCC pending the resolution of post-sentencing hearings regarding restitution. Id. As set forth below, during the course of his stay at the NCCC, Romano spoke with another inmate and his wife about breaking out of prison, and directed defendant Mirkovic to create an offshore bank account, gather information on how to disappear, and obtain fake identification.

II. The Conspiracy to Murder the Judge and the AUSA

On August 7, 2012, law enforcement officers received information from an inmate housed at the NCCC (the "CI") that defendant Romano was seeking to hire someone to kill the Judge and the AUSA. Id. at ¶ 4. On August 10, 2012, in a conversation captured on audio recording, Romano discussed his desire to torture and kill the Judge and the AUSA to retaliate against them. During that conversation, the CI agreed to assist Romano in locating a contract killer. Id.

On August 21, 2012, an undercover officer posing as a contract killer for hire ("UC-1") visited defendant Romano at the NCCC. Id. at ¶ 5. During the meeting, which was captured on audio and video recordings, Romano expressed his desire to have UC-1 carry out acts of violence on Romano's behalf. Id. Preliminarily, Romano provided the name of an individual with whom he was engaged in a financial dispute ("John Doe"). Id. Romano offered to pay UC-1 $3,000 for the assault of John Doe and indicated that he had contacts outside of jail who would make the payments to UC-1. Id. Romano further indicated that he had additional assignments for UC-1 once the assault was successfully completed.

Subsequently, during telephone calls from the NCCC that were recorded, defendant Romano contacted defendant Dejvid Mirkovic and directed him to meet with UC-1. Id. at ¶¶ 7-9. In an effort to avoid detection by law enforcement, Romano placed

4

telephone calls using other inmates' personal identification numbers (PINs), in violation of NCCC regulations. Id. at ¶ 6. Mirkovic followed Romano's instructions and contacted UC-1 to set up the meeting. Those telephone conversations and messages were also recorded.

On September 10, 2012, UC-1 visited defendant Romano at the NCCC to discuss the assault on John Doe. During that meeting, Romano assured UC-1 that once the assault was completed, Romano would hire UC-1 for a big job, which he characterized as serious work. Id. at ¶ 10. On September 14, 2012, defendant Mirkovic met with a second undercover officer ("UC-2"), who was posing as an associate of UC-1, and delivered a $1,500 down payment for the assault against John Doe. This meeting was recorded. Id. at ¶ 11.

On September 25, 2012, UC-1 met with defendant Mirkovic, who had flown to New York from Florida. Id. at ¶ 13. The meeting was recorded. During that meeting, UC-1 showed Mirkovic "proof" of the assault of John Doe, in the form of John Doe's identification card and a photograph staged to appear to depict John Doe after the assault.[1] Mirkovic paid UC-1 the $1,500 balance for the assault. Id. Mirkovic then left UC-1 and visited Romano at the NCCC for further instruction. After meeting with Romano, Mirkovic returned to meet with UC-1 and offered to pay UC-1 to murder the Judge and the AUSA on behalf of Romano. Id. at ¶ 14. This meeting was also recorded. Specifically, Mirkovic provided the names of the Judge and the AUSA and stated that he and Romano would pay UC-1 $40,000 for their murders, beginning with a $20,000 down payment. Id. Additionally, Mirkovic transmitted requests from Romano regarding how the murders should take place, requesting that the heads of the Judge and the AUSA be preserved in formaldehyde as

---

[1] John Doe was never assaulted. The "proof" provided to defendant Mirkovic was a staged photo and an identification card John Doe provided to law enforcement officers.

souvenirs.  Id.  Mirkovic then paid UC-1 $12,000 in cash for the murders of the Judge and the AUSA.  Id. at ¶ 15.

On September 28, 2012, defendant Romano was transferred from the NCCC to the Queens Private Detention Facility.  Id. at ¶ 17.  Prior to being transferred, Romano discussed his plan to murder the Judge and the AUSA with the CI.  He also gave the CI a handwritten note to mail to defendant Mirkovic.  The note read: "Hey Dave  Thank God they moved me.  Come Visit me at the New Jail.  Make sure all our Projects continue Joe."  Id.

On October 2, 2012, defendant Mirkovic flew from Florida to New York and met with UC-1.  Id. at ¶ 18.  The meeting was recorded.  During the meeting, Mirkovic delivered an additional $10,000 in cash for the murders of the Judge and the AUSA.  Further, Mirkovic promised to pay UC-1 the remaining $18,000 upon confirmation of the murders' successful completion.  Id.

On October 9, 2012, defendants Romano and Mirkovic were placed under arrest.  During a search of Mirkovic's home, law enforcement agents seized a loaded handgun and $18,000 in cash – the balance of the contract for the murders of the Judge and the AUSA. After waiving his Miranda rights, defendant Mirkovic confessed that: (1) Romano told him he was very angry at the sentence he received and wanted the Judge and the AUSA murdered so that his case would be transferred to another judge; (2) he paid $3,000 in cash on behalf of Romano to UC-1 for the assault of John Doe;[2] (3) Romano directed him to pay $40,000 to UC-1 to kill the Judge and the AUSA; (4) he paid $22,000 as a down payment for the murders.  Mirkovic further admitted that he had started the same coin sales "scam" in Florida that Romano had been perpetrating in New York.

After Romano was arrested, he waived his Miranda rights and confessed that: (1) he offered to pay UC-1 $3,000 for the assault of John Doe; (2) he instructed Mirkovic to

---

[2] In the post-arrest statements, Mirkovic and Romano identified UC-1 and John Doe by the descriptions or names by which they knew them.

pay UC-1 for the assault; (3) after UC-1 showed Mirkovic a photo of the completed assault of John Doe, he and Mirkovic agreed to pay $40,000 for the murders of the Judge and the AUSA; and (4) he was serious about the John Doe assault and the murders of the Judge and the AUSA and paid money to accomplish them. Romano further admitted that he used other inmates' PIN numbers to place telephone calls, and that he discussed a prison break scheme, requested that his wife acquire a plastic handcuff key, and directed her to research the viability of such a key, which she did, though he claimed that his plans to break out of prison were not serious. Romano also signed a written confession admitting that he conspired to murder the Judge and the AUSA.

III.     Efforts to Corrupt the Judicial Process

Defendant Romano went to great lengths to subvert the judicial process in connection with his fraud prosecution. First, while on bail, Romano engaged in further telemarketing fraud, in clear violation of the terms of his pretrial release. Second, he planned an escape, involving defendant Mirkovic and his wife in such activities as opening an offshore bank account, obtaining fake identification, and researching how to smuggle handcuff keys into the prison. Third, Romano and Mirkovic plotted to murder the judge and prosecutor assigned to Romano's case on account of the performance of their official duties. Fourth, Romano evaded prison safety regulations to pursue his criminal designs, using other inmates' PIN numbers to place conspiratorial telephone calls and employing Mirkovic to pay those inmates for their assistance.

In addition, during the coin fraud prosecution, defendant Romano engaged in obstruction of justice through violent witness tampering. For example, in a recorded conversation, Romano described his witness tampering efforts after he learned that co-defendant Rusty Barnes was trying to cooperate. Romano directed Barnes to come to his house at which time, according to Romano, "I pull the fucking knife out, and I put it to his

7

fucking throat, and I said 'I'll cut your head off right now, asshole. I'll cut your fucking head clean off.'" According to Romano, during this assault, he cut Barnes's neck. In Romano's presence, Barnes then called his attorney and told him that he no longer wished to pursue cooperation with the government.

IV.     Media Attention

Since the defendants' arrests, media organizations have closely tracked the case. In October 2012, the arrest and indictment of the defendants garnered substantial publicity. See, e.g., Mosi Secret, U.S. Alleges Plot to Kill a Prosecutor and a Judge, N.Y. Times, October 9, 2012; Robert Kessler, Two Accused in Plot to Kill LI Judge, Prosecutor, Newsday, October 9, 2012. Since that time, the media has continued to cover the case, including its significant developments. See, e.g., Robert Kessler, Two Indicted in Alleged Plot against Judge, Prosecutor, Newsday, November 8, 2012; Jessica Dye, Two Plead Not Guilty to Plotting Hit on Federal Judge, Prosecutor, Reuters, November 13, 2012. There is every reason to expect that this coverage will continue during trial.

## DISCUSSION

I.      Applicable Legal Standard

The Second Circuit has repeatedly upheld the use of anonymous juries where there is strong reason to believe that the jury needs protection, and reasonable precautions are taken to minimize any adverse effect on the defendants and their fundamental rights. See, e.g., United States v. Pica, 692 F.3d 79 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979). The Second Circuit recently reiterated that "when genuinely called for and

when properly used, anonymous juries do not infringe a defendant's constitutional rights." Pica, 692 F.3d at 88. The decision to utilize an anonymous jury "is left to the district court's discretion." Id. Anonymous juries have been found to be particularly appropriate in cases where defendants have engaged in obstruction of justice, particularly through the use of violence. See, e.g., Quinones, 511 F.3d at 295-96; Thai, 29 F.3d at 801; Persico, 832 F.2d at 717.

In United States v. Barnes, the Second Circuit upheld the empaneling of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141. The Barnes court specifically rejected any claim that the law requires jurors to disclose their identities:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If 'the anonymous juror feels less pressure' as a result of anonymity, … this is as it should be — a factor contributing to his impartiality.

Id. at 140-41.

Courts in the Second Circuit have taken a number of factors into consideration when determining whether or not a jury needs the protection of anonymity. These include: (1) the nature and seriousness of the charges; (2) the potential threat of corruption of the judicial process, including the likelihood that the defendant would attempt to interfere with the process either by himself or through his associates; and (3) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that could impair their ability to be fair and impartial. See Gotti, 459 F.3d at 346; Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192.

II.  An Anonymous Jury is Necessary and Appropriate in this Case

Application of the factors set forth by the Second Circuit demonstrates that the empaneling of an anonymous jury is necessary and appropriate in this case. The charged crimes are extraordinarily serious, the threat of corruption of the judicial process is extremely high, and the case is sure to generate significant publicity. As a result, an anonymous jury is clearly warranted.

A.  Nature and Seriousness of the Charges

First, the crimes charged in this case are extremely serious and violent in nature, as they involve a plot to murder a federal judge and prosecutor on account of the performance of their official duties. The seriousness of the charges is obvious from the face of the indictment, and is underscored by the fact that the defendants face statutory maximum sentences of life in prison, see 18 U.S.C. § 1117, and guidelines sentences of life in prison, see U.S.S.G. §§ 2A1.5, 3A1.2.[3] But the audio recordings, which the government will play for the jury, highlight the true severity of the charged crimes: on those recordings, the defendants not only attempt to engage a hit man to perform the contract killings of two public servants, but Mirkovic relays Romano's gruesome request that the heads of the intended victims be severed and preserved in formaldehyde. The serious and violent nature of the charges alone would cause a juror reasonably to fear for his or her own safety. See Quinones, 511 F.3d at 295-96; Thai, 29 F.3d at 801; Barnes, 604 F.2d at 141.

In addition, in targeting a judge and prosecutor on account of their official actions relating to Romano's conviction, the defendants attempted to strike at the heart of the criminal justice system. The defendants' demonstrated willingness to retaliate against those

---

[3] U.S.S.G. § 2A1.5(a) sets the base offense level for murder conspiracy at 33. The offense level is enhanced by 4 levels because the conspiracy was a contract killing, U.S.S.G. § 2A1.5(b)(1), and 6 levels as it involved intended official victims and the offense was motivated by the victims' official status, U.S.S.G. § 3A1.2(b), resulting in a total offense level of 43. Level 43 carries a recommendation of life imprisonment no matter what the criminal history of the defendant.

10

involved in Romano's conviction will undoubtedly prompt jurors to fear for their own safety in sitting in judgment of the defendants, absent anonymity and the other requested precautions. See Quinones, 511 F.3d at 295-96 (upholding anonymous jury in part because obstruction of justice murder sent "powerfully frightening message . . . of the terrible consequences awaiting anyone who cooperated in defendants' prosecution); Thai, 29 F.3d at 801 (anonymity warranted in cases involving defendant's demonstrated willingness to tamper with judicial process).

      B.      Corruption of Judicial Process

The threat of corruption of the judicial process is extremely high. Not only are the defendants charged with a murder conspiracy intended to obstruct justice, but the defendants took numerous additional steps aimed at corrupting the judicial process. As set forth above, the government possesses compelling evidence that defendant Romano violently tampered with potential witness Rusty Barnes, threatening to murder Barnes and lacerating Barnes's neck in a successful effort to thwart Barnes's cooperation with the government. Similarly strong evidence demonstrates that defendants Mirkovic and Romano plotted Romano's escape from prison and flight overseas to evade justice. Where, as here, the defendants have demonstrated the willingness and capability to interfere with the judicial process, there is "strong reason to believe the jury needs protection." Gotti, 459 F.3d at 345; see also Aulicino, 44 F.3d at 1116; Wong, 40 F.3d at 1376-77; Paccione, 949 F.2d at 1192.

These factors combine to create an environment at trial that "would cause a juror to reasonably fear for his own safety." Vario, 943 F.2d at 241 (anonymous jury appropriate where trial evidence "will depict a pattern of violence by the defendants and [their] associates such as would cause a juror to reasonably fear for his own safety"); see Wong, 40 F.3d at 1376 (recognizing that fears of retaliation may affect the jury's ability to render an impartial verdict). Indeed, it would be entirely reasonable for a juror to fear that

11

individuals who conspired to murder the assigned judge and prosecutor, and assaulted and threatened to murder a potential witness would also be willing and able to engage in acts of violence directed at jurors to prevent conviction or seek revenge after conviction. Accordingly, an anonymous jury is necessary to ensure an impartial jury and protect it from harm. See Vario, 943 F.2d at 241; Thomas, 757 F.2d at 1364-65.

C.  Publicity

The extensive press coverage in this case also favors empaneling an anonymous jury. As discussed above, the media has closely tracked this case since the announcement of the arrests in October 2012, and publicity during the trial will, no doubt, intensify.

The Second Circuit has repeatedly held that the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial." Paccione, 949 F.2d at 1193; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717; Barnes, 604 F.2d at 141. Juror anonymity is an effective remedial measure to prevent possible prejudice and inappropriate contact by the press.[4] If jurors could be located by reporters, the fairness of the trial could be compromised. Jury anonymity is an appropriate measure to avoid inappropriate contact and possible prejudice. Moreover, potential jurors will be more willing to serve if they are confident that they and their families will not be subjected to scrutiny, harassment, and possible threats. The media's intense interest in this case clearly "militate[s] in favor of an anonymous jury." Vario, 943 F.2d at 240.

---

[4] It is well settled that where media coverage potentially threatens the fairness of a trial, remedial measures must be taken to prevent the prejudice. Sheppard v. Maxwell, 384 U.S. 333, 363 (1966). "The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." Id. "[T]he trial court has a responsibility to the public as well as to the defendant to maintain the integrity of the criminal process." United States v. Shiomos, 864 F.2d 16, 18 (3d Cir. 1988).

Lastly, because anonymity would be ineffective if jurors interacted freely with the public in the courthouse during recesses and at the beginning and end of each trial day, the jurors should be kept together during recesses, taken or provided lunch as a group, and escorted to and from the courthouse in a manner designated by the Marshals Service. Paccione, 949 F.2d at 1191-92; United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir. 1990).

III.   An Anonymous Jury Will Not Prejudice the Defendants

Courts confronted with a need to protect jurors from outside influences have taken effective steps to provide for a meaningful and informed jury selection process. While the right to a meaningful voir dire of jurors is clearly established, Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), questioning may be limited by the Court. As the Second Circuit noted in affirming the use of anonymous jury in United States v. Barnes,

> as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 137.

The trial court has substantial discretion in controlling and limiting the voir dire process. See Rosales-Lopez 451 U.S. at 188-89 (1981); Barnes, 604 F.2d at 137. A full voir dire may be conducted about subjects other than the juror's name, address and employer's name, and the parties and counsel will have an unrestricted opportunity to observe the jurors during the voir dire process. See, e.g., Barnes, 604 at 142-43. Where jury anonymity is warranted, the Second Circuit has found that a defendant's rights are protected by the district court's conduct of "a voir dire designed to uncover bias as to issues in the cases and as to the defendant[s]." Vario, 943 F.2d at 242 (quoting Barnes, 604 F.2d at 140); see Thai, 29 F.3d at 801. Here, through the use of voir dire, the Court can provide the parties with ample information about the background and possible bias of the potential jurors.   See,

13

e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 241-42; Tutino, 883 F.2d at 1133.

Furthermore, courts have rejected defendants' claims that use of an anonymous jury will create the unfair appearance that the defendants are dangerous and that, as a result, the jury will be more likely to convict them. See, e.g., United States v. Branch, 91 F.3d 699, 724 (5th Cir. 1996) (rejecting defendants' objection to an anonymous jury based on the "speculative inference that the jurors were more likely to render a guilty verdict because of their belief that the defendants were dangerous"). In particular, the Second Circuit has concluded that the danger that the anonymous procedure would cast unfair aspersions on the defendants is averted where the Court gives the jury a plausible reason for not disclosing their identity or taking other security measures. See Thai, 29 F.3d at 801 (Court stated that "[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in Federal Court. Anonymity will ward off curiosity that might infringe on juror's privacy . . . ."); Paccione, 949 F.2d at 1193 (explained as protection of jury from contacts by the media); Tutino, 883 F.2d at 1133 (jury instructed: "It is a common practice followed in many cases in Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual."). If the Court grants the motion for an anonymous jury, the government respectfully requests an instruction informing the jury in a neutral manner that anonymity is necessary to protect them from the media and the curious, and that selection of anonymous juries is not an unusual procedure. See, e.g., Thai, 29 F.3d at 801; Tutino, 833 F.2d at 1133; Barnes, 604 F.2d at 137; Persico, 621 F. Supp. at 879-80.

**CONCLUSION**

For all of the foregoing reasons, the government respectfully requests that its motion for an anonymous jury and other related protective measures be granted.

Dated: Brooklyn, New York
February 19, 2013

                                    Respectfully submitted,

                                    ERIC H. HOLDER, JR.
                                    Attorney General of the United States
                                    WILLIAM J. HOCHUL, JR.
                                    United States Attorney
                                    Western District of New York

By:    /s/ Marshall L. Miller
            Marshall L. Miller
            Una A. Dean
            Assistant U.S. Attorneys
            (718) 254-6421/6473

cc:    Clerk of Court (JFK) (by ECF)
      Joseph Kilada, Esq. (counsel to defendant Romano) (by ECF)
      Susan Kellman, Esq. (counsel to defendant Mirkovic) (by ECF)